IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 24, 2023 Session

## STATE OF TENNESSEE v. DAVID LYNDEL COCHRAN

**Appeal from the Criminal Court for Knox County**
**No. 117184   Steven W. Sword, Judge**
_____

## No. E2023-00142-CCA-R3-CD
_____

Defendant, David Lyndel Cochran, stands convicted of one count each of aggravated rape and aggravated kidnapping. He appeals, arguing the evidence was insufficient to sustain his convictions and that the trial court erred in allowing a sexual assault nurse examiner to offer expert testimony. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TOM GREENHOLTZ, JJ., joined.

Joshua D. Hedrick, Knoxville, Tennessee, for the appellant, David Lyndel Cochran.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Charme P. Allen, District Attorney General; and Hector Sanchez and Joseph Welker, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Background and Factual Summary

In February 2020, the Knox County Grand Jury indicted Defendant, David Lyndel Cochran, on one count of aggravated rape, three counts of rape (under alternate theories), and two counts of aggravated kidnapping (also under alternate theories). Before trial, the State dismissed one count each of rape and aggravated kidnapping, and Defendant was tried in April 2022 on one count of aggravated rape, two counts of rape under the alternate theories of a victim who did not consent and a physically helpless victim, and one count of aggravated kidnapping.

The proof at trial established that on August 25, 2019, Sam Peroulas, the owner of Pero's restaurant (Pero's) in Powell, Tennessee, informed his staff that he would be closing the restaurant indefinitely at the end of that evening's dinner service. Once the restaurant closed at 9:00 p.m., Mr. Peroulas allowed his staff to have an "open bar" party to thank them for their work. Defendant, a line cook at the restaurant, and the victim, a female server, were among the employees who stayed at Pero's.

Mr. Peroulas testified that he was not partying with his staff the night of August 25, but at one point, he looked into the restaurant and saw the victim on a bench, surrounded by "several people" who were "trying to give her water[.]" This prompted Mr. Peroulas to tell his staff that he did not want them driving home drunk, and he encouraged his staff to stay at a hotel across the street. Mr. Peroulas could not recall which hotel was across the street from the restaurant, but evidence produced at trial established that both a Holiday Inn Express and a LaQuinta Inn were across Conner Road from the restaurant, which was near the intersection of Emory Road and Interstate 75 in northern Knox County. The Super 8 Motel referenced later in this opinion was located about 0.7 miles from the restaurant, on the other side of I-75.

Several Pero's employees who were at the restaurant the night of August 25 testified at trial. Kayla Stout, a manager, was present for thirty to forty minutes after the bar closed and planned to leave before 10:00 p.m. Ms. Stout recalled seeing the victim, Defendant, and two or three other employees sitting at a table on the restaurant's patio, drinking tequila from a bottle. She stated they "were just talking and drinking," appearing to be "having a good time." Ms. Stout, said the victim "looked intoxicated, but she didn't look like she was about to pass out or anything."

Stephanie Childress, a host at the restaurant, testified that after the restaurant closed, she sat on the patio, drinking with the group which included the victim and Defendant. Ms. Childress did not notice any flirtatious behavior by the victim toward Defendant, either that night or at any time before the incident. As the evening progressed, Ms. Childress noticed that the victim began slurring her words and looked like she could "get sick pretty soon[.]" Ms. Childress got a bucket and put it near the victim who eventually became "pretty intoxicated," looking "sleepy" and "start[ing] to sway." Ms. Childress also saw the victim "was starting to get sick and she was kind of going in and out" of consciousness so she carried the victim from the patio to inside the restaurant, placing the victim first on the floor and then in a booth and giving her a bucket in which to vomit.

Ms. Childress testified that she had to leave at 10:30 p.m., but before she left, she and a coworker, Morgan Peters, talked about what to do with the victim. Ms. Childress

- 2 -

said that Defendant interrupted the two women and told them that he "would make sure that [the victim] got home safe."

Joseph Reynolds, a cook at the restaurant, testified that after drinking for a while, the victim "wasn't able to really stand up on her own. Her words were extremely slurred. She just had no kind of real coordination." Mr. Reynolds was present when the victim was carried from the patio into the restaurant and placed in a booth near the exit door. Afterwards, he and Defendant "float[ed] around the idea of putting her in a hotel for the night so she could sleep." Mr. Reynolds stated he "was pretty sure" he left the restaurant before the victim left.

Surveillance videos from Pero's on the night of the incident were played during Mr. Reynolds's testimony. The videos reflect that at approximately 9:55 p.m., the victim was carried into the restaurant and placed on the floor. At approximately 9:59 p.m., the victim was picked up from the floor and carried to a booth in the bar area. The victim was then carried from this booth to a nearby table at 10:10 p.m.; this table was one of several located along a long bench. At 10:41 p.m., the victim was picked up and carried out of the restaurant, but she was carried back into the restaurant at 10:50 p.m. and placed at another booth. After several male workers and Ms. Peters attempted to speak with her, the victim was physically picked up and carried out of the restaurant for the last time at 23:30:15 (11:30 p.m.). The video depicts Defendant leaving the restaurant a minute later. Generally, the videos depicted the victim being unable to stand or walk on her own, her arms hung limply at her sides as she was carried, and on several occasions, towels or trash cans were placed in front of the victim's face.

Ms. Peters, who by trial, had changed her name to Morgan Burum, was a server and bartender at Pero's. She testified that the victim became "really sick" after drinking, and vomited several times. According to Ms. Burum, the victim was unable to walk and was slurring her words to the point that she was "barely" able to speak. Ms. Burum said that several of Pero's workers, including Defendant, were involved in a "collective effort" to care for the intoxicated victim, with Ms. Burum and Ms. Childress taking the lead in caring for the victim. Ms. Childress carried the victim from the patio and placed her in a booth inside the restaurant. Eventually, the victim was carried to Defendant's car and placed in the back seat. According to Ms. Burum, Defendant said that "he was taking her to a hotel. He didn't say that he was staying, but he said he was taking her to a hotel. . . . Like, across the street."

Ms. Burum acknowledged that the morning after the restaurant closed, she received a text from the victim stating her boyfriend was mad and moving out of the residence the victim and her boyfriend shared. The victim's text also read, "I woke up in a hotel with [Defendant]. I didn't do anything, but idk [I don't know] what to do[.]" In response, Ms.

Burum sent a series of brief text messages: "Omg," "Say you stayed with me??" "I can call him," and "Text you a fake message whatever[.]" Ms. Burum acknowledged these texts were meant to "make up an alibi" if the boyfriend asked about the incident.

The victim testified she had worked at Pero's around five or six months at the time the restaurant closed. She knew Defendant from work, but denied ever "hanging out" with Defendant or making plans with him the night of the incident. She admitted that at one point, she passed along Defendant's phone number to someone so Defendant could purchase marijuana. This was the "only contact [she had] ever had with [Defendant] outside of work."

The night the restaurant closed, the victim, who described herself as not being a "big drinker," recalled drinking four or five tequila shots, using the restroom, and signing a sheet to show interest in working at one of Mr. Peroulas' other restaurants. The victim remembered little of what followed that evening. She recalled sitting on the patio with Ms. Burum, and the next thing she remembered was waking up in a motel room with Defendant.

The victim did not remember how she arrived at the motel, or asking to be brought there. She recalled that when she awoke the next morning, she asked Defendant where she was; Defendant replied that they were at the Super 8 Motel. According to the victim, Defendant told her he brought her there because she was "really drunk." The victim then asked Defendant to take her to her car so she could return home, and Defendant did so. When she awoke, the victim was fully clothed, wearing the same clothes she had worn the previous evening, including her undergarments. She also did not feel any physical discomfort so she told Knox County detectives that initially, she did not believe any sexual activity had occurred between her and Defendant. However, when the victim returned home, she felt "kind of sore down there" when she attempted to use the restroom, and she thought "like something might have happened. But [she] didn't know exactly what took place." This prompted the victim to call Defendant, who told her that nothing happened. However, the victim testified that Defendant later called her back and told her, "[Y]ou know what happened and you know that you wanted it."

The victim said that on the night of August 25 into the morning of August 26, she had received several missed phone calls from her boyfriend, who was still her boyfriend at the time of trial. She stated that her boyfriend was upset with her because he did not know where she was that night, and that he was "driving all night, trying to find where [she] was at." The victim and her boyfriend reported the incident to law enforcement, and drove to the Super 8 Motel to meet with detectives. She was instructed to go to the sexual assault clinic, where she underwent a sexual assault examination; the victim "felt soreness" when the examiner touched her genital area.

Knox County Sheriff's Office Detective Keith McFarland testified that on August 30, 2019, he and fellow Knox County Detective Ken Clabough interviewed Defendant at a Knoxville Walmart parking lot. The interview was consensual and Defendant was free to leave, which Defendant acknowledged in the interview. The interview occurred inside Detective Clabough's police car, which had recording equipment. A recording of the interview was played at trial. At the start of the interview, Defendant acknowledged the victim drank heavily on the restaurant's patio after closing time; after a while, Defendant said, he saw the victim vomiting into a bucket. He acknowledged other people had to help her walk, but he denied the victim passed out at any time. Defendant said that before the victim was brought from the patio into the restaurant, she had been flirting with him, and he asked her if she wanted to go home or to a hotel. According to Defendant, the victim said she wanted to go to a hotel because she feared her boyfriend.

Defendant told the detectives that sometime after the victim was brought from the patio into the restaurant, she and Defendant left Pero's. Defendant said that when he arrived at his car—which he claimed he was borrowing for the evening—the victim was already inside the car. Defendant said he was not certain how the victim arrived at the car, but he believed the victim walked there on her own. Defendant claimed that once he got into the car, he asked the victim, again, whether she wanted to go home or to a hotel. According to Defendant, the victim kissed him and again said that she wanted to go to a hotel. Defendant said this was consistent with plans they had made before that evening; he told the detectives that he and the victim had discussed plans to "hook up" and that they "had talked about it for a week," with said conversations happening "basically every day." When asked if anyone at work had witnessed these conversations, Defendant mentioned several kitchen employees who would have heard them. When detectives asked Defendant what "hook up" meant, he said it was to have sex—"just pick somewhere and go"—as opposed to taking the victim on a date. Defendant acknowledged he and the victim did not send any text messages about meeting up.

Defendant told the detectives that after leaving Pero's, he went to a Pilot gas station to buy cigarettes and water. He then drove to the Super 8 Motel. Defendant initially told the detectives that the victim walked into the motel room, then stated he helped the victim walk, but when the detectives told him the victim appeared to be passed out on the motel video, he then stated he carried the victim into the room, placed her into the bed, and they both fell asleep.

Defendant initially told the detectives he was unsure whether he had sex with the victim, saying that he "could have been dreaming" that he and the victim slept together. However, Defendant eventually acknowledged having sex with the victim. He told the detectives that after he fell asleep, he awoke to the victim, who he claimed was nude from the waist down, "rubbing" on him. Defendant claimed the victim then performed oral sex

on him before she climbed on top of him, and they had intercourse. He said he ejaculated inside the victim. Defendant told the detectives that he then took a shower. He claimed the victim was asleep and clothed when he returned from the shower.

As the interview continued, Defendant told the detectives that the morning after their encounter, the victim woke Defendant, upset because her boyfriend was mad at her and planning to leave her. According to Defendant, the victim told him to tell anyone who asked that she and Defendant "didn't do anything." Defendant claimed the victim's boyfriend called him and "started cussing" him, and Defendant denied all allegations. At the conclusion of the interview, Defendant provided detectives with a DNA sample.

Laurine Rollins, a registered nurse and sexual assault nurse examiner, was offered by the State as an expert in the field of forensic nursing. Defendant objected, and the trial court conducted a jury-out hearing, which is described in detail later in this opinion. After the hearing, Ms. Rollins was qualified by the trial court as an expert in forensic nursing, and testified that she conducted a forensic sexual assault examination on the victim's genital area which revealed "some linear red areas between the . . . majora and minora labia. She had linear red at the fourchette . . . which would be at the end of the vaginal opening." In her report, the nurse stated she was unable to insert a speculum into the victim's vaginal opening due to the victim's claims of pain. The nurse collected DNA swabs from several areas of the victim's body, including her vagina.

Ms. Rollins testified that the victim's injuries were consistent with sexual assault, but she acknowledged it was "possible" that the injuries were inflicted by other means. She acknowledged the possibility that alcohol use could decrease vaginal lubrication, but she was unfamiliar with the medical studies cited by defense counsel on cross-examination. The nurse also stated that "hammering-type" penetration before a woman was "aroused" could cause abrasions, but continued to opine that the victim's injuries in this case resulted from sexual assault.

Malonda Rutledge, a former private laboratory DNA examiner who, at the time of trial, was employed by the Charlotte-Mecklenburg Police Department, tested DNA samples taken from the victim's sexual assault examination against Defendant's DNA profile. The vaginal swabs contained a mixture of two DNA profiles; the victim was one contributor, and the contributor of the other profile was a male. The examiner testified that Defendant could not be excluded as a contributor to the male profile, and the chance that the male profile belonged to an unrelated person, chosen at random, was one in 210 octillion persons—a number which far exceeds the earth's population of seven billion persons.[1]

---

[1] In its brief, the State identifies an octillion as the number one followed by twenty-seven zeroes.

Tennessee Bureau of Investigation (TBI) Special Agent Kimberly O'Bryant testified that she tested the victim's blood for various substances on August 26. The blood sample tested negative for alcohol. She testified that it was "possible" for a person whose blood alcohol concentration was .20 the night before to eliminate the alcohol over a thirteen-to-fourteen-hour period.

Defendant did not testify or present witnesses on his behalf. After deliberating, the jury found Defendant guilty of aggravated rape, two counts of rape (under the alternate theories of lack of consent and physically helpless victim), and aggravated kidnapping. The trial court subsequently merged the first three counts, resulting in convictions for one count each of aggravated rape, a Class A felony, and aggravated kidnapping, a Class B felony. The trial court subsequently sentenced Defendant to an effective sentence of twenty-five years in the Tennessee Department of Correction.[2]

Defendant filed a timely motion for new trial, where he renewed his objection to the sufficiency of the evidence under Rule 29 of the Tennessee Rules of Criminal Procedure, and renewed his objection to Ms. Rollins's testimony. As to the second ground, Defendant stated specifically:

> 1. It was, respectfully, error to permit the description of the steps of the sexual assault examination.

> 2. It was, respectfully, error to find that the testimony of the sex assault nurse examiner was admissible expert testimony under *McDaniel v. CSX Transportation*, 955 S.W. 2d 257 (Tenn. 1997) and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

The trial court denied the motion for new trial. Defendant's timely appeal follows.

## II. Analysis

### A. Sufficiency of Evidence

Defendant contends the evidence produced at trial was insufficient to sustain his convictions. Specifically, Defendant contends the evidence was insufficient to establish that the victim suffered unlawful sexual penetration, as was necessary to sustain the jury's guilty verdicts for aggravated rape and rape. Defendant further argues that, absent proof

---

[2] The trial court imposed concurrent terms of twenty-five years for aggravated rape and twelve years for aggravated kidnapping. Defendant does not challenge the lengths of these sentences on appeal.

that he intended to commit rape when he removed the victim from Pero's, the evidence was insufficient to convict Defendant for aggravated kidnapping.

The standard of review for a claim challenging the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). This standard of review is identical whether the conviction relies on direct evidence or circumstantial evidence, or a combination of both. *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

A guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal; therefore, the burden is shifted to the defendant to prove why the evidence is insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)). On appeal, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Id.* at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual disputes raised by such evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 405, 410 (Tenn. 1990). Consequently, we are precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

1. Aggravated Rape and Rape

In this case, the jury found Defendant guilty of one count of aggravated rape and two counts of rape. As charged in the first count of the indictment, a defendant commits aggravated rape when the defendant unlawfully sexually penetrates a victim, the defendant causes bodily injury to the victim, and the defendant acts intentionally, knowingly, or recklessly. *See* Tenn. Code Ann. § 39-13-502(a)(2). As charged in the second count of the indictment, a defendant commits rape when the defendant unlawfully sexually penetrates the victim, the victim does not consent to the penetration (or the defendant knows or has reason to know at the time of penetration that the victim does not consent), and the defendant acts intentionally, knowingly, or recklessly. *Id.* § 39-13-503(a)(2). As charged in the third count of the indictment, a person commits rape when the defendant unlawfully sexually penetrates the victim, the defendant knows or has reason to know that

the victim is physically helpless, and the defendant acts intentionally, knowingly, or recklessly. *Id.* § 39-13-503(a)(3)(C).

The evidence produced at trial, viewed in the light most favorable to the State, established that the victim became intoxicated after drinking several tequila shots after the close of business at Pero's on the night of August 25, 2019. Those coworkers who testified at trial said the victim's intoxication was significant; she slurred her words to the point that her speech was indecipherable, and she lost the ability to walk steadily, as she had to be carried from the patio where she had been drinking into the restaurant. Video footage from inside Pero's the night of the incident supports the coworkers' assessment of the victim's lack of coordination, and shows her being carried with her arms hanging limply before she is placed on a bench. Several coworkers testified the victim vomited before she was removed from the restaurant. The victim's intoxication left her unable to remember being removed from the restaurant or being taken to the Super 8 Motel by Defendant. Despite the victim and several coworkers testifying that Defendant and the victim had no significant interaction before or during the night of August 25, Defendant told his coworkers that he would make sure the victim got home safely. However, instead of bringing the victim home, she was carried to Defendant's car, and Defendant drove her to the Super 8 Motel over a half-mile from the restaurant rather than one of the two motels across the street from the restaurant. Defendant's admissions to the police and the victim, as well as DNA evidence taken from the victim as part of the sexual assault examination, all make clear that Defendant had sexual intercourse with the victim. Once the victim returned home, she experienced pain in her genital area which continued during her sexual assault examination. The nurse who conducted the examination observed vaginal abrasions which were consistent with sexual assault.

This evidence was sufficient for a jury to conclude, beyond a reasonable doubt, that Defendant, while acting intentionally, knowingly, or recklessly, unlawfully sexually penetrated the victim, that the victim suffered injury as the result of that penetration, that Defendant knew or should have known that the victim did not consent to the penetration, and the victim's intoxication rendered her physically helpless at the time of the penetration. Thus, the evidence was sufficient for the jury to find Defendant guilty of aggravated rape and rape under the alternate theories of lack of consent and a physically helpless victim. At trial, Defendant advanced the theory that the sexual encounter was consensual, the victim was not so intoxicated as to be helpless at the time of the encounter, and the victim— who awoke fully clothed and initially believed no sexual activity occurred between her and Defendant—only claimed she was the victim of rape after her boyfriend became angry that she was out all night and awoke in bed with another man. Defense counsel also cross-examined the sexual assault nurse examiner to try to establish that the victim's injuries resulted from something other than sexual assault. However, after hearing the evidence produced at trial, the jury rejected Defendant's contentions, as was its right. As stated

above, on appeal we "will not reweigh the evidence, nor will we substitute our inferences for those drawn by the trier of fact." *State v. Ross*, 49 S.W.3d 833, 845 (Tenn. 2001) (internal citations omitted). Defendant is not entitled to relief on this issue.

## 2. Aggravated Kidnapping

Here, the jury found Defendant guilty of the fifth count of the indictment, which was aggravated kidnapping. As charged in this case, "Aggravated kidnapping is false imprisonment . . . [t]o facilitate the commission of any felony[.]" Tenn. Code Ann. § 39-13-304(a)(1). Furthermore, "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § 39-13-302(a). In circumstances such as the current case, in which aggravated kidnapping is charged with an underlying offense, the conviction for aggravated kidnapping may only be sustained if "the removal or confinement has criminal significance above and beyond that necessary to consummate some underlying offense, such as robbery or rape." *State v. White*, 362 S.W.3d 559, 577 (Tenn. 2012).

The evidence produced at trial, viewed in the light most favorable to the State, established that Defendant, despite interacting minimally with the victim before the night Pero's closed, made a point to inform his coworkers that he would ensure that the extremely intoxicated victim made it home safely. The victim was then carried by others from the restaurant and placed in Defendant's car, at which point Defendant drove the victim not to her residence or one of the two motels across the street from Pero's, but to the Super 8 Motel located more than a half-mile from the restaurant. He then carried her into the motel. As stated above, the other evidence produced at trial was sufficient to establish Defendant then raped the victim at the motel.

This evidence was sufficient to establish, beyond a reasonable doubt, that Defendant's removing the victim from Pero's substantially deprived the victim of her liberty, that Defendant removed the victim to facilitate her rape, and that his actions in removing the victim from Pero's were not merely incidental to her rape. At trial, Defendant sought to establish that he took the victim from the restaurant and brought her to the motel so she could "sleep off her drink," but the jury rejected this argument. Such was the jury's prerogative, and on appeal, we may not substitute our inferences or conclusions for those reached by the jury at trial. Because the evidence was sufficient to convict Defendant of aggravated kidnapping, he is not entitled to relief on this issue.

## B. Admission of Sexual Assault Nurse Examiner Testimony

Defendant contends the trial court erred in permitting Ms. Rollins, the sexual assault nurse examiner, to offer opinion testimony that the victim's genital injuries resulted from

sexual assault. Specifically, Defendant contends "the nurse examiner's testimony failed to 'substantially assist' the trier of fact, and the trial court failed to make a finding that it did." Defendant claims the nurse's opinion was unable to substantially assist the jury in determining whether the victim consented in this case, and therefore he argues the nurse's opinion testimony should not have been allowed.

In a jury-out hearing, Ms. Rollins, who has been a registered nurse since 1979 and a sexual assault nurse examiner since 2006, testified that she became a sexual assault examiner after taking a weeklong, forty-hour class, followed by an internship. Ms. Rollins stated that she had testified in court fewer than ten times previously, all in Tennessee state courts.

The sexual assault nurse examiner testified that the victim's vaginal injuries were "like a blunt-force trauma," adding that examining the victim "was difficult . . . because she was very sore." She explained that injuries to the vagina like the ones the victim suffered occur "when the vagina's not prepared to have sex . . . there's like, no lubrication." She opined that such injuries "were consistent with sexual assault." She acknowledged that some vaginal injuries could occur even if the vagina were adequately lubricated during penetration, such as those occurring during consensual "rough sex," but she rejected the contention that such injuries could occur if the victim were penetrated before adequate sexual arousal. She said that in her professional experience, "you don't see those type[s] of injuries except in sexual assaults."

After the sexual assault nurse examiner's testimony, defense counsel argued "there's not sufficient proof to establish that her methods are accepted in the scientific community" or that "the basis of her opinions are accepted in the scientific community. It appears that her basis of expertise is her long time in this field." However, defense counsel added that "part of" him wanted to cross-examine Ms. Rollins in front of the jury, as he had done in the jury-out hearing. Counsel stated that he had no issue with the nurse testifying that the injuries were consistent with penetration, but he expressed difficulty with the nurse opining that the victim's injuries were caused by "sexual assault." Defense counsel did not argue during this hearing that Ms. Rollins's testimony failed to substantially assist the trier of fact as to a material issue.

The trial court rejected Defendant's motion to exclude the expert testimony, stating that Ms. Rollins had training and experience in the field and that testimony from sexual assault nurse examiners was "an established science." The trial court observed Ms. Rollins was "struggling" to explain the basis of her knowledge, and the trial court added that although the nurse testified that the victim's injuries were consistent with sexual assault, the nurse was unable to rule out other causes. The trial court stated Ms. Rollins testimony offered "a lot of fodder for cross-examination," but the potential issues with the nurse's

testimony went to "the weight to be given her testimony rather than the admissibility." The court did not explicitly find that Ms. Rollins's testimony would substantially assist the jury.

The State argues Defendant has waived the issue because on appeal he "abandoned his claim that [Ms.] Rollins's methods were not accepted in the scientific community and now contends that the court abused its discretion in admitting her testimony because it 'failed to substantially assist the trier of fact.'" We agree.

To preserve an issue for appeal, a defendant must object contemporaneously *and* identify the reason for his objection. *See* Tenn. R. Evid. 103(a)(1) (providing that a timely objection to preserve an issue for appeal must state "the specific ground of objection if the specific ground was not apparent from the context"). While the rule provides different requirements for situations in which the evidence is excluded or admitted, in both instances, the objecting party has the duty to state the specific basis for the objection. *State v. Biggs*, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006). The failure to identify the grounds for the objection constitutes waiver of the issue. *See* T.R.A.P. 36(a), Advisory Commission Comments ("The last sentence of this rule is a statement of the accepted principle that a party is not entitled to relief if the party invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error."). In addition, "[a]s a general rule, a party may not litigate an issue on one ground, abandon that ground post-trial, and assert a new basis or ground on appeal." *State v. Leach* 148 S.W.3d 42, 55 (Tenn. 2004). "[A] party is bound by the ground asserted when making an objection. The party cannot assert a new or different theory to support the objection in the motion for new trial or in the appellate court." *State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994). "When . . . a party abandons the ground asserted when the objection was made and asserts completely different grounds . . . in this [c]ourt, the party waives the issue." *Id*. at 635.

Here, Defendant had ample opportunity at trial to object to Ms. Rollins's testimony because he believed it would not substantially assist the jury. He chose not to do so, and only objected to her capacity as an expert. Per Defendant's objection, the trial court made its ruling solely on the *McDaniel* standard, and did not consider Defendant's argument that he now asserts on appeal. Under the rule and binding precedent, Defendant is bound by the grounds he advanced when he objected at trial and may not advance a new argument in this court. This issue is waived.

### III. Conclusion

For the reasons stated above, we affirm the judgments of the trial court.

_____
MATTHEW J. WILSON, JUDGE